R. W. Semmler v. Commissioner.
R. W. Semmler v. Commissioner
Docket No. 11937.
United States Tax Court
1948 Tax Ct. Memo LEXIS 245; 7 T.C.M. (CCH) 92; T.C.M. (RIA) 48031; February 26, 1948
C. F. Rothenburg, Esq., for the petitioner. Cecil H. Haas, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: This proceeding, after concessions made at trial, involves a deficiency in income tax in the amount of $63,676.05 for the taxable year ended October 31, 1942, and a deficiency of $11,311.90 in income and victory taxes for the fiscal year ended October 31, 1944. The principal issue is whether the income of the Wholesale Supply Co., for the years 1942 and 1944, is taxable to petitioner. An overpayment of $13,665.85 is claimed for the taxable year 1942 on account of respondent's refusal to allow an operating loss of $26,658.27 in the taxable year 1943, which year is involved under the forgiveness *246 feature of the Current Tax Payment Act of 1943. Findings of Fact The petitioner, an individual 50 years of age, and residing in Detroit, Michigan, filed his returns for the taxable years with the collector in that city. He has four children, Reynold, born in 1922; Robert, born in 1928; Howard, born in 1930, and Donald, born in 1931, respectively, all of whom lived at the family residence. In 1922 the petitioner entered the flat roof contracting business under the trade name of Arrow Roofing and Sheet Metal Works, hereinafter referred to as "Arrow," and had a shop first at the corner of Hurlbut and Warren East, Detroit, and later at 5100 St. Jean Avenue, Detroit. A flat roofing contractor builds roofs on flat surfaces by applying felt, pitch and bituminous materials. A steep roof contractor applies ready-made material, such as slate and shingles, to steep roofs. At first petitioner's business was confined to the construction of roofs on stores, apartments and industrial plants in Detroit. Later, he did such work in other parts of Michigan and in Buffalo, New York, Ohio, Kentucky, Virginia and Erie, Pennsylvania. He never engaged in steep roofing contracting work. Most of his *247 work was done on large buildings. Petitioner is one of the leaders in his business and Arrow is recognized as one of the largest organizations engaged in the flat roofing business in and around Detroit. Wholesale dealers in material for flat roofs could purchase such products from manufacturers for resale at a discount of 10 per cent from published lists, while retailers and roofing contractors could buy from them only at a discount of 5 per cent. Petitioner desired to be in a position to obtain a wholesaler's discount on material he required in his business. In 1938 he acquired a lot, improved by a one-story industrial building located at 5108 St. Jean Avenue, Detroit, with the intention of engaging in the wholesale flat roofing supply business in the near future for the purpose of obtaining material required in his business at prices available to wholesalers. Thereafter, he moved the business of Arrow to the property. In 1938 business was dull and there was no good reason to commence the new business. The petitioner also wished to create some security for his sons, by setting them up in a business related to the one with which he was familiar. Petitioner knew nothing about *248 the wholesale roofing supply business. In March or April 1940 he formed such a business under the name of Wholesale Supply Co., hereinafter sometimes referred to as "Wholesale." He handled only flat roofing supplies, until June 1941, and maintained a set of books for the business separate from his flat roof contracting business. Until October 31, 1941, employees of Arrow and Wholesale did work interchangeably for both companies. On March 3, 1941, petitioner filed a certificate with the Circuit Court for the County of Wayne, Michigan, of his intention to engage in business at 5108 St. Jean Avenue, under the name of Wholesale Supply Co. By a warranty deed executed on January 2, 1941, bearing an acknowledgment dated February 7, 1941, and recorded February 16, 1942, petitioner and his wife conveyed to their four sons, the premises located at 5108 St. Jean Avenue, as a gift to give them financial security. The instrument recites consideration of one dollar and other valuable consideration paid to the grantors; also that the conveyance is subject to a mortgage of $12,700. By an instrument executed on January 2, 1941, petitioner's wife, as guardian for her four minor children, leased *249 to petitioner, doing business under the name of Arrow, for a term of one year at a rental of $12,000, for the term, the premises at 5108 St. Jean Avenue. The lease contained a provision requiring the tenant to keep the premises in good repair and upon the termination of the lease to deliver the property to the owner in the same condition as when received, reasonable use and wear and damage by the elements excepted. At that time the wholesale and contracting businesses of petitioner were occupying separate parts of the building. In June 1941 petitioner employed Gilbert W. Behling, an experienced outside wholesale salesman of steep roofing material, as manager of the Wholesale Supply Co. at a weekly salary of $75, plus a commission of 10 per cent of gross profits, and thereafter Wholesale commenced to sell steep roofing supplies in addition to flat roofing material. Behling took full charge of the purchases and sales and did the billing and collecting. He had built up a large following of purchasers of steep roofing material and residing, the accounts of many of which Behling brought with him to Wholesale. Behling was receiving a salary of $275 a month from the United Products Corporation *250 at the time he was employed by petitioner. His salary, including commission, from Wholesale to October 31, 1941, was $1,801.21. A commission of 10 per cent on gross profits was paid to him during the period of three years after November 1, 1941. In his income tax return for the period of 10 months ending October 31, 1941, petitioner reported receipts of $1,264,969.68 from Arrow and Wholesale, net profits of $43,213.25 from the businesses and net income of $45,337.26. Prior to October 31, 1941, Wholesale purchased roofing material from manufacturers at a discount of 10 per cent on listed prices and sold to Arrow its requirements of such material at the same price. Purchases at such prices enabled Arrow to make lower bids for work in competition with other bidders. Sometime during that period manufacturers threatened to discontinue sales to Wholesale, because its sales to Arrow at cost were contrary to their policy of not giving discount under published prices to an individual engaged in both the wholesale and contracting businesses. Petitioner became alarmed over the matter and discussed the question with his wife and Behling and decided that the only way to separate the businesses *251 was to give the wholesale supply business to his sons, which, with some reservations, he did effective at the close of October 31, 1941. The primary motive for the gift was to enable petitioner to continue the price advantage he had over other flat roofing contractors in the purchase of material for Arrow. A secondary, but minor, reason was to create financial security for his sons. On October 30, 1941, the petitioner filed a petition in the Probate Court of Wayne County, Michigan, for the appointment of his wife as guardian of their four minor sons. The petition recites that the minors possessed personal property valued at "$10,000 upward" and real property valued at $30,000. The petition was granted the same day, subject to filing bond of $25,000. A written agreement entered into on November 1, 1941, between petitioner and his wife, acting as general guardian of their four sons, recites in pertinent part, that on or about October 31, 1941, petitioner gave to his sons all of his interest in the Wholesale Supply Co., having a net value of $100, and that "for the profitable operation of the said business it became necessary to maintain certain outward contacts and appearances so *252 that the estate of the said minors would realize the highest possible income from the said business." The instrument contains the following provisions, material here: "1. First party [Guardian] hereby agrees to and with second party [Petitioner] that he shall maintain contact with the sources of supply and continue the bank account of Wholesale Supply Company as it existed as of a date prior to the 30th day of October, A.D. 1941, until such time as the business of the minors is firmly established and until a change in the operation would in no way injure the conduct of the business. "2. That second party shall lend the support of his business acumen and personal stability to the business of the Wholesale Supply Company, it being deemed for the best interest of said business to retain the connection of second party with it." The agreement also included provisions for withdrawing from the county clerk the certificate filed by petitioner which recited that the Wholesale Supply Co. was being operated by him and the filing by the guardian of a new certificate for the operation of the business by her; and for continuing the lease between the guardian and Arrow and the execution *253 of an agreement for the leasing by Wholesale from Arrow of space occupied by the former. The instrument states that the guardian had no intesest in the bank account; yet, it was agreed that the guardian might make withdrawals therefrom and that petitioner would do nothing to jeopardize the interest of the sons in the account. Petitioner requested counsel, on about October 15, 1941, to prepare an instrument transferring the business of Wholesale to his four sons. Such a document was executed by petitioner on January 2, 1942, and specified good will and other property as assets being transferred. On October 31, 1941, prior to the gift, the books of Wholesale had an account receivable of Arrow for material sold to it. Petitioner desired to transfer to his sons, with substantially no assets, the business of Wholesale, and, accordingly, the account was reduced by $38,000 on the books of each business, leaving a book net worth of Wholesale in the amount of $100. The balance sheet of Wholesale, as of November 1, 1941, was as follows.. Assets
Cash, National Bank of Detroit
$ 1,879.43
Accounts Receivable -
Regular
83,277.08
Special
2,697.74
Reserve for bad debts
(2,618.91)
Inventory - Merchandise
57,168.53
Truck, less reserve for depreciation
706.19
$143,110.06
Liabilities
Accounts Payable
$141,830.57
Michigan sales tax
1,179.49
Net worth
100.00
$143,110.06
*254 The petitioner filed a Federal gift tax return in which he reported gifts of the premises at 5108 St. Jean Avenue and the Wholesale Supply Co., the latter at a value of $100. On February 2, 1942, the Probate Court for Wayne County vacated its order fixing bond at $25,000 for the guardian and entered an order that bond be filed in the amount of $100. On April 16, 1942, the guardian filed a petition, signed on or before February 27, 1942, with the Probate Court for the County of Wayne for the entry of an order authorizing and directing her to conduct the business of the Wholesale Supply Co. The guardian asserted in her petition that the business of Wholesale Supply Co. and manner of conducting it would be substantially the same as before the gift to the minors. The petitioner waived notice of hearing on the guardian petition and consented to the allowance thereof. The court granted the petition the same day and directed that until further order of the court, the business be conducted in substantially the same manner as it had been done prior to the transfer thereof to the wards, also that the accounts of the guardian be audited at least annually, and that reports be made with the *255 accounts. The first annual account, covering the period January 1, 1941, to October 31, 1942, and report of the guardian, were sworn to by her on July 20, 1943. The account was filed with the probate court on December 14, 1944, and the report on April 3, 1945. The account lists, and the report refers to, a disbursement of $8,000 as a loan to Arrow, evidenced by a note. The loan was made from rentals received by the guardian and was paid in 1943. Detailed records of receipts of the guardian fail to show any interest received. The report recites that "for the best interests of her said wards, it became necessary to enter into an agreement with the" petitioner on November 1, 1941, also that petitioner performed all of the duties and obligations assumed by him under the terms of the agreement, and that the contract was abrogated on May 1, 1943, as to the bank account. During the fiscal years ended October 31, in 1942, 1943, and 1944, Behling was in charge of the operation of Wholesale, and about twice a week discussed its affairs with petitioner's wife. Petitioner was present during some of the conferences, especally ones held at the end of the year, and when requested, he approved the *256 conduct of the business by his wife and Behling. Petitioner knew how the business was being conducted and that it was being capably managed. If his assistance had been needed, he would have become aware of any difficulties encountered in carrying on the business. In other respects petitioner assisted in the conduct of the business of Wholesale, including the making of a few contacts in 1943 and 1944 for material. After October 31, 1941, Wholesale and Arrow occupied with communicating doors, separate quarters and offices in the same building, located at 5108 St. Jean Avenue. The offices had separate entrances. Wholesale had a complete set of books, separate from those maintained for Arrow. Petitioner did not draw checks on the principal bank account of Wholesale after October 31, 1941. Such checks were signed by his wife at her home or at the company's office, generally the former. The checks were frequently taken to her home by petitioner for her signature. At some undisclosed time after November 1, 1941, a special account was opened in the name of petitioner and thereafter used to pay for merchandise, and expenses, including salaries, petty cash and other incidental expenses *257 of Wholesale. Petitioner and the bookkeeper of Wholesale had power to sign checks drawn against the account. At times checks were accumulated for about a week and then presented to petitioner for signature. Checks were signed by the bookkeeper when petitioner was not available for that purpose. The guardian was never an employee of Wholesale. During the fiscal years 1942, 1943 and 1944, Arrow paid rental of $1,000 a month for the premises at 5108 St. Jean Avenue, one-half of which was charged to Wholesale for the space occupied by it. Arrow, on account of being the lessee, paid the light, heat, and water, telephone and repair bills for the premises, and office expenses, for which it charged Wholesale at the rate of $375 a month for the fiscal years 1942 and 1943, and $5,021.97 for the fiscal year 1944. In addition to telephone service, occasionally, for a few hours at a time, employees of Arrow rendered service for Wholesale for which the latter was also charged. On November 1, 1941, aside from Behling, the employees of Wholesale consisted of a driver, a warehouseman and a typist-bookkeeper. New employees were obtained as business increased. On October 31, 1944, it had from eight *258 to ten employees. Petitioner was never asked to guarantee accounts payable of Wholesale. Wholesale discounted all of its bills, and manufacturers, with at least one exception, extended credit to it for that reason. The Celotex Corporation extended credit to it after October 31, 1941, because of petitioner. Petitioner owned 40 per cent of the stock of the Arrow Sheet Metal Works, Inc., a Michigan corporation formed in 1940, hereinafter referred to as the Michigan Corporation, to engage in the flat roof contracting business. It had its office in Buffalo, New York, and carried on its activities in, and in the vicinity of that city. After October 31, 1941, petitioner devoted considerable time carrying on the activities of the corporation. In 1940 petitioner acquired 50 per cent of the stock of the Acme Roofing Corporation, a corporation engaged in the flat roof contracting business in Detroit, Michigan. The corporation occupied premises other than at 5108 St. Jean Avenue. During the years 1942, 1943 and 1944, petitioner's activities with the corporation consisted of rendering assistance in the preparation of estimates and acting in an advisory capacity. It had less volume of business *259 than Arrow had. Petitioner, during the years 1942, 1943 and 1944, also had a 50 per cent interest in Arrow Sheet Metal Works, a partnership formed in 1938 or 1939 and engaged in the flat roofing and contracting business in Detroit. Petitioner served the firm in an advisory capacity. The firm's chief activity was the making of repairs under guarantees on big jobs and building roofs on small buildings, stores and apartment houses. It carried on its activities from 5108 St. Jean Avenue, where Arrow had its place of business. During 1941 to 1944, inclusive, Arrow entered into contracts for flat roofs, exclusive of small jobs, as follows: Number of
Amount of
Year
Contracts
Contracts
1941
24
$1,660,295.00
1942
23
757,633.02
1943
9
205,013.00
1944
7
111,965.00
The work was done on a completed contract basis. Petitioner devoted most of his time in 1942, 1943 and 1944 to carrying out the contracts. Arrow had three or four employees in its office, including estimators. Petitioner checked all estimates for work. The number of its employees engaged in outside work fluctuated with the amount of construction work being done. Arrow employed from 50 to 150 *260 at a time on outside work. Petitioner did not, at any time after October 31, 1941, borrow money from Wholesale. During the fiscal years ended October 31, 1942, to 1944, inclusive, he made one loan, in March 1944, to Wholesale. The loan was in the amount of $8,400 and was made at the request of the guardian, upon the suggestion of Behling, that the money be borrowed from him rather than a bank, she having loaned her maximum amount of about $32,000, to obtain additional money required to pay for a large shipment of material which had been acquired at a low price. Petitioner's loan was repaid over a period of from 30 to 60 days. Wholesale never borrowed money from any other persons. In 1941, prior to November 1, the sales of Wholesale Supply Co. were in the amount of $869,183.94, of which $607,406.40 were made to Arrow, $58,826.76 to the Acme Roofing Corporation, $12,583.21 to the Arrow Sheet Metal Works, Inc., and $190,367.57 to other contractors, and retailers, of which $39,323.29 represents sales of flat roofing material prior to June 1, 1941. The sales during the fiscal years 1942, 1943 and 1944 were as follows: 1942
1943
1944
Arrow
$459,288.41
$88,584.83
$ 554.62
Acme Roofing
Corp.
106,326.91
11,797.10
17,387.05
Arrow Sheet
Metal
Works, Inc.,
Buffalo
185,572.51
75,192.64
22,938.70
Arrow Sheet
Metal Co.,
Detroit
10,283.79
6,464.59
18,473.35
Others
333,774.73
396,662.99
358,614.55
Total
$1,095,246.35
$578,702.15
$417,968.27
*261 The sales to Arrow were its requirements of flat roofing material. The sales to "Others" of steep roofing and siding material were made under accounts brought to the business, or thereafter acquired, by Behling. No steep roofing material accounts were acquired by petitioner. Wholesale purchased material from manufacturers at a discount of 10 per cent on their published lists. After November 1, 1941, it sold to Arrow at a price equal to a discount of 8 per cent on such lists. Had Arrow made the purchases direct from the manufacturer the discount would have been 5 per cent on their published lists. The decreases in sales after 1942 was due to restrictions of the Government on industrial building. The books of Wholesale disclose accounts receivable owed by the businesses in which petitioner had a financial interest, known as special accounts, and owed by others, known as regular accounts, and net expenses, including labor recorded in the books as cost of goods sold, as follows: Special
Regular
Expenses
October 31, 1942
$164,024.03
$34,255.86
$43,319.48
October 31, 1943
62,580.23
40,766.24
70,054.73
October 31, 1944
30,764.83
23,890.82
58,695.09
*262 The balance sheets for the fiscal years 1942, 1943 and 1944, disclose no capital contributions, except that the one for 1944 shows a "Cash addition to investment" of $19,000. The books maintained for the wards contained an account for each, to which was credited an equal amount as his share of the property at 5108 St. Jean Avenue, amount $3,815.60, and Wholesale, amount $25, and the net income each year from the property and business. The aggregate of the credits to each amount for the period January 1, 1941, to October 31, 1944, was $39,209.61. The books disclose that amounts were charged to the accounts each year for income taxes and life insurance taken out in the names of the four children under policies in which petitioner and his wife were named beneficiaries, and in the case of Robert E. Semmler, the total of $130.31 in September and October 1944 for five checks issued to him. No other charges were made in the accounts. The total amount charged to the account of Reynold was $7,604.06; Howard, $6,406.47; Donald, $6,677.61; and Robert, $6,726.93. The books maintained for the guardianship show no withdrawal of $19,000 as a cash addition to the investment in Wholesale, or such *263 an amount for any other purpose. Wholesale filed returns as a joint venture for the fiscal years ended October 31, in 1942, 1943, and 1944, in which it reported net income of $56,818.71, $25,542.29 and $21,028.11, respectively, and one-fourth thereof as the share of each child of petitioner. The guardian reported to the probate court the $56,818.71 as income "after allowing her compensation in the sum of Ten Thousand ($10,000.00) * * *." The respondent included the amounts, corrected to include additional income, in the income of petitioner in determining petitioner's income tax liability for the fiscal years ended October 31, in 1942, 1943, and 1944, upon the ground that the net income of Wholesale was taxable to him. The amounts reported as the share of each child were included in returns filed for them by the guardian. The returns filed for three of the children reported no amount received as salaries or other compensation for services rendered. The returns filed for Reynold, the other son, reported $2,050 and $2,250 of such income from Arrow in the fiscal years 1941 and 1942, respectively, and $300 of such income in the next taxable year without specifying the source of the income. *264 The returns of petitioner for 1941 and 1942 contain deductions of $1,450 and $1,437.07, respectively, for contributions paid exclusively to the Bethel Baptist Church. No contributions were claimed as deductions in his returns for 1943, when he reported a net loss, and 1944, when he reported net income of $8,660.37. The return filed by Wholesale for 1942 contains no deduction for contributions. Its returns for 1943 and 1944 reported contributions paid of $1,039 and $1,053.70, respectively. Of the amounts, $1,000 was reported as having been paid to the Bethel Baptist Church in 1943 and $800 in 1944. The returns filed for the sons in 1941 and 1942 contained no deductions for contributions paid. Each of their returns for 1943 and 1944 contained deductions for one-fourth of the amount of contributions reported by Wholesale and in addition thereto, amounts ranging from $12.50 to $40, all to the Bethel Baptist Church. Opinion Cases of this general nature usually involve alleged partnerships between husband and wife, or among family groups in which the transferor retains an interest. Here, the gift depended on was allegedly of petitioner's entire interest in the assets and business of *265 Wholesale to his four minor sons. It is now well settled that in spite of the validity of a gift, the circumstances may be such that, for Federal income tax purposes, the transferor, or person furnishing property, remains taxable on the income earned by the property under the broad provisions of section 22 (a). , affirming a memorandum opinion of this Court; , in which there was no proof of transfer of the property involved from petitioner's wife to him, yet, for tax purposes, the petitioner was regarded as owner of the business; , where petitioner furnished capital for a business conducted in the name of petitioner's wife, by a manager; , in which petitioner unsuccessfully contended that decedent's wife was sole proprietor of a business; . The petitioner argues that the broad doctrine enunciated in ; ; , and similar cases of the Supreme Court, *266 which was applied by us to the facts in the proceedings above cited, is not applicable to the circumstances prevailing here. The argument proceeds from allegations, in general, that the gift had a legitimate business purpose and was made to provide security for the donees; that petitioner exercised no control or right of management over the business, and that Behling's efforts, and not his, were responsible for the earnings of the business during the taxable years. The respondent contends to the contrary. The difference between the parties is due largely to their application of the evidence, some of which is confusing and conflicting. Our conclusions on the evidence are embodied in the findings of fact. Comment thereon is required. Purpose of Gift We find no reason to question the validity of the gift, as between the parties, even though no instrument of transfer was executed until two and one-half months later. . Immediate steps were taken to appoint petitioner's wife as general guardian for the donees, and subsequently court approval was obtained for the operation of the business by the guardian. The gift, however, is not conclusive *267 here. The petitioner acquired the property at 5108 St. Jean Avenue in 1938, to use in connection with the operation of a wholesale business of flat roofing material for the primary purpose of obtaining at wholesale prices, material required by him in the flat roof contracting business he had been for many years and was conducting under the name of Arrow. Associated with the idea, but a minor consideration, was a desire to start his sons, the oldest of whom was then 16 years old and the youngest 7, in a business having relation to the one in which petitioner was engaged. The business was commenced, in March or April 1940, under the name of Wholesale Supply Co., and thereafter until November 1, 1941, Arrow obtained its requirements of material from it at the price it paid manufacturers, which was 10 per cent under their published lists. Other companies in which petitioner had a financial interest purchased flat roofing material from Wholesale, it not appearing whether they purchased at a discount. Sales to such companies for the first five months of 1941 constituted about 87 per cent of the total sales, and sales to Arrow to about 88 per cent of the sales to all of them. In June *268 1941, petitioner engaged a manager for Wholesale, and added steep roofing material to the line of material handled by Wholesale. For about the next five months, or until October 1941, sales to petitioner's companies were about 74 per cent of total sales of Wholesale, and about 90 per cent of such sales were made to Arrow. The record of sales of Wholesale for the first 10 months of 1941 discloses that petitioner's business was the chief beneficiary of the venture. The gross saving to him was the additional discount of 5 per cent on purchases amounting to about $600,000. Manufacturers from whom Wholesale purchased flat roofing material threatened to refuse sales to petitioner unless he ceased to conduct both a wholesale and contracting business. Petitioner decided to transfer the business of Wholesale to his minor sons, which he did, effective November 1, 1941. Again the chief objective was to be in a position to continue the purchase of Arrow's requirements of material at a discount higher than ordinarily available. Thereafter Arrow obtained a discount of 8 per cent on its purchases from Wholesale, 2 per cent less than theretofore. Purchases by Arrow in the fiscal year 1942 were *269 about 42 per cent of all sales of Wholesale, including steep roofing material, which Arrow and other companies in which petitioner was interested did not use. The proportion was less in the next two years, but that was attributable to restrictions placed on the construction of private building. Except for a small increase in the gross cost of material, petitioner was no worse off, as regards the business of Arrow, than he was before the transfer, and he still received his materials at a discount, greater than that of competitors. It does not appear in evidence whether the manufacturers were aware of the new arrangement. That price advantage to himself, rather than security for his sons, was the controlling reason for the gift, is supported by petitioner's testimony. He first testified, on direct examination, that he purchased the premises at 5108 St. Jean Avenue to enter the wholesale business and thereby be able to obtain lower prices for the material Arrow was using. In response to a question a few minutes later during the same examination, he testified that he had no reason for acquiring the building "* * * other than what I stated." Additional questioning then produced testimony *270 that he had a desire to provide security for his sons as they grew up by establishing them in a business with which he was familiar. Later during the same examination he testified that as a combination wholesaler and contractor he was able to obtain a wholesaler's discount from manufacturers. A few minutes later his counsel asked him to give his reasons for making the gift. His reply was, "The reasons were as I stated just a moment ago, reasons of buying materials at lower prices." The next question was whether there were any other reason. Petitioner's answer was: "Also, for financial security of the boys." It is apparent from the testimony on the point that the objective uppermost in the mind of petitioner when acquiring the building and later when entering the wholesale business was to obtain, and after transferring it to his sons, to continue to obtain material for Arrow at lower prices. The prime motivating factor for the gift was the demands made upon petitioner by manufacturers that he separate his wholesale and contracting businesses. If petitioner had been more interested in the financial security of his sons than profits for himself, he would have paid to Wholesale, their *271 company, the customary price for material acquired after the gift. Wholesale gave Arrow the benefit of four-fifths of the discount of 10 per cent it received from manufacturers, leaving only one-fifth of the discount as a margin to recover handling charges and other costs of operation. The expenses of Wholesale in the fiscal years 1942, 1943, and 1944, were about 4, 12 and 14 per cent, respectively, of sales, so that its sales to Arrow were made at considerable loss to it. Obviously, therefore, sales to Arrow were not on a sound business basis, and served no business purpose so far as Wholesale was concerned. We do not know the operating costs of Wholesale prior to October 31, 1941. If they were in excess of 2 per cent of cost of material from manufacturers (and the contrary is not shown by petitioner, on whom was the burden of proof) by the gift to his sons, petitioner placed himself in a position of being able to purchase material for Arrow at a net cost lower than theretofore. This actual price reduction was to the economic benefit of petitioner and to the detriment of his sons. Though later business other than that from petitioner's company did develop, in the beginning, it is *272 clear, the reason for the gift was in furtherance of the petitioner's business, rather than that of the sons, whose interests would have required the retention of the entire 10 per cent discount granted manufacturers. The gift disposed of the business, and served no business purpose so far as Wholesale was concerned, which realized nothing from it; on the contrary, Wholesale had $38,000 of accounts receivable removed from its assets before the transfer was made, and in that additional respect was worse off after the gift. For the reasons given, and other circumstances of record, some of which will be referred to hereafter, we are unable to conclude that the transfer involved merely a business purpose and financial security for the donees. Extent of Gift The argument of petitioner, upon brief, seems to be based upon the theory that the business had a value of only $100, the book net worth of Wholesale and the value reported for gift tax purposes. The point is important in deciding the source of the capital employed in the business. It is apparent that more was transferred than the nominal amount of $100. Wholesale was an established going concern under management which petitioner *273 regarded as very efficient. Its profits for the first 10 months of 1941 are not of record. Its total sales for that period, when a large proportion was made to Arrow at cost, were $869,183.94. Its gross receipts for the fiscal year 1942 were $1,095,246.35, and net income $56,818.71, after, as the guardian reported to the probate court, the payment to her of a salary of $10,000. Comparison of sales for 10 months of 1941, prior to the gift, with the next 12 months, indicates that the good will had, at October 31, 1941, great value, and the companies in which petitioner was interested were established customers, and Behling had a following of purchasers of steep roofing material. This customer list, an element of good will, had considerable value, in support of which no more need be referred to than the substantial earnings made, in spite of sales to Arrow at a loss, without capital investment, except for an unexplained $19,000 later, in 1944. The "good will and business" of Wholesale were expressly transferred in the instrument executed by petitioner on January 2, 1942. Petitioner's testimony with respect to what he gave to his sons is confusing and in one respect contrary to a fact *274 subsequently stipulated. First he testified that he gave Wholesale in name only, without assets, except for a book worth of $100. Petitioner knew the history of Wholesale and was familiar with its prospects for future success and was an experienced business man, in view of which we are unable to accept his testimony that he transferred nothing more than a mere name, of only nominal worth. He also testified that he did not reduce the accounts receivable of Wholesale by $38,000 for debts of Arrow and that such reduction as he made in net worth resulted from his withdrawal of all of Wholesale's "* * * money that belonged rightfully to me and I made no gift to anyone." In fact, no money was actually withdrawn and accounts receivable due from Arrow were reduced $38,000 in connection with the gift. It does not appear that immediately after the gift, the sons had any property other than the real estate at 5108 St. Jean Avenue and Wholesale. The petition filed by petitioner on October 30, 1941, for the appointment of a guardian for his sons recites that the minors had personal property of a value of more than $10,000. It is evident, in the absence of further explanation, that such valuation *275 should be considered placed on the business of Wholesale. In addition, the agreement of November 1, 1941, between petitioner and the guardian contains a provision that the latter had no interest in the bank account of Wholesale as it existed on a date prior to October 30, 1941. [The parties were not more specific.] This discloses an understanding with the guardian that the gift was not to include cash of Wholesale on an unspecified date, but that statement is followed in the same sentence by a provision that petitioner would not jeopardize the interest of the "minors" in the account. He agreed to continue the account until a change would not be detrimental to the business. Thus the petitioner is seen to be furnishing the use of a bank account for the continuation of the business. It should here be noted that when the gift to the sons was made, the petitioner owned an active business, and that Behling had been manager thereof for about five months. Petitioner did not merely start his sons out with nothing but a good manager. Except for reducing the accounts receivable by about $38,000 and reserving an interest in the bank account, he transferred to them a going concern. In some *276 respects similar to the situation in , there was change of form, but substantial continuation of business in the same way - and primarily for the petitioner's benefit because of the importance of the advantage in discount. In that case the business income was taxed to the petitioner. We conclude that such capital as was employed in the business was contributed by petitioner. None was supplied after the gift, except $19,000 in 1944, and as to it, we know nothing of the source, and nothing in the record is opposed to the idea that it came from profits derived from petitioner's gift. Control of and Services Rendered Wholesale Petitioner argues that he retained no right of control of Wholesale and that after the gift he exercised none, performed no services for it in any way, in short, that "He effectively eliminated all his interest in the company and its business." He says that after the gift, Behling alone managed, controlled and supervised all of the policies and operations of the company. Is the evidence consistent with such allegations? The bill of sale reserved no express right to participate in the business of Wholesale; but *277 that there were mental reservations when the gift was made and an understanding thereon with the guardian is convincingly shown by provisions of an agreement between petitioner and the guardian on November 1, 1941. The instrument recites that it would be necessary to maintain "certain outward contacts and appearances" to enable the donees to realize the maximum financial benefit from the business. This indicates a purpose to conceal from the public, customers and others with which Wholesale was doing and would conduct business transactions, the fact that the business had been assigned. If the transfer were bona fide and had no more than a valid business purpose, there appears no sound reason for withholding from all interested parties knowledge that the sons held title to the business. At the time of the gift a certificate was on file in the office of the county clerk disclosing that Wholesale was being operated by petitioner. The agreement provided for the withdrawal of the notice and the filing of a certificate by the guardian showing that she was operating the business for her wards. No proof was made that the petitioner's certificate was withdrawn or that a new certificate was *278 ever filed by the guardian. A purpose to participate in the affairs of the business is otherwise shown by another provision of the agreement in which petitioner agreed to give Wholesale the benefit of his business ability, "* * * it being deemed for the best interest of said business [Wholesale] to retain the connection of second party [petitioner] with it." He also agreed to maintain contact with the sources of supply, and to "continue the bank account * * * as it existed * * * prior to the 30th day of October, A.D. 1941." Yet, in effect, he denies that he complied with his agreement or retained any connection. In the report made by the guardian in connection with her first annual account, filed with the court on April 3, 1945, the guardian asserted that petitioner had performed all of the duties required of him under the contract entered into on November 1, 1941. Opposed to this statement of the guardian to the court, to which she was accountable, at a time when income tax liability against petitioner resulting from the gift had not been asserted in a deficiency notice, is the testimony here by petitioner that after the gift he did not control, manage, or in any way conduct *279 the operations of Wholesale, including purchases and sales, and except for a few contacts made in 1943 and 1944 for material at the request of Behling, that Behling controlled and operated the company. Elsewhere, his testimony is that he did not maintain contacts with manufacturers, as required of him by provisions of the contract with the guardian. This was not because business was good, but because his presence was required in other places at all times. He testified, in addition, that all of his time in 1942, 1943, and 1944 was spent in carrying out contracts of Arrow for roofing work. Behling testified that after the gift he made all of the purchases and sales for Wholesale; that he formulated its sales policy, and that he was in charge of its affairs, and, accordingly, looked to nobody for directions on how to operate the business. He also testified that during such period petitioner had nothing "whatever" to do with Wholesale. Blind acceptance of this testimony would require a conclusion, as petitioner would have us reach, that after the gift Behling alone performed all of the material duties without control, supervision or assistance from petitioner or the guardian. Other evidence, *280 also weighed, requires a different conclusion. No petition was filed with the probate court until April 16, 1942, five and one-half months after the gift, for an order authorizing the guardian to operate the business and therein a representation was made to the court that the business would be conducted in substantially the same manner as before the gift was made. The guardian, as the representative of the owners of title to the business, represented to the probate court as late as 1945 that petitioner had rendered services to Wholesale. (He had agreed to "lend the support of his business acumen and personal stability.") She had frequent opportunity to accumulate sound reasons for arriving at such a conclusion, for petitioner testified that she consulted with Behling at her home or at Wholesale's office at least a couple of times a week pertaining to business in general, and on occasions, especially at the end of the year, he was present and gave his approval "of their handling of the business if they asked me" and that such a question "would be almost a natural thing, being related to the family." Control, in an essential matter, over the affairs of Wholesale is plainly present, *281 from the fact that after the gift Arrow continued to receive a large discount on purchases. Petitioner did not offer evidence whether such favorable terms were extended to other purchasers of material. The earnings of Wholesale indicate that they were not. Neither does any evidence in the record touch upon any negotiations for such favorable price terms. The discount, based upon published prices of manufacturers, was reduced from 10 to 8 per cent, and, accordingly, some arrangement was entered into. That the policy was adopted and carried out at all times important as the result of control, direct or indirect, of petitioner over Wholesale is clear, for it will be noted that Wholesale was making only 2 per cent on the sales to petitioner's company (without considering the sales costs), whereas its sales expense was a minimum of 4 per cent, the net result thus being a 2 per cent loss to Wholesale. Nothing but control by petitioner can reasonably explain the continued taking of such loss by Wholesale. In short, all of Wholesale's business with Arrow was for the benefit of petitioner, not Wholesale. No company dealing at arm's length, not under control, could conceivably continue such *282 a practice. Control by petitioner is also indicated by Wholesale's accounts receivable at the close of the fiscal years 1942, 1943, and 1944. The special accounts with petitioner's companies at the close of 1942 were about 83 per cent of all accounts receivable, whereas sales to such purchasers during the year were only 70 per cent of total sales. In 1943 and 1944 the ratios in the same order were about 31 and 60, and 14 and 60 per cent, respectively. Again, a measure of control by petitioner appears, as to bank account. At first checks were signed by the guardian on an account kept in the name of Wholesale. This practice was discontinued at some undisclosed but material time, and an account was opened in the name of petitioner, with himself and Wholesale's bookkeeper authorized to draw against it. The reason for the change is not explained in the evidence. Neither is there any explanation for opening the account in the name of petitioner, who, according to his testimony, was out of the city all or most of the time. No special account was necessary. Why not place it in the name of Behling, who was in complete charge, according to testimony? The effect of the arrangement was to *283 place in the hands of petitioner, money belonging to Wholesale. The conditions under which funds were furnished him to open the account are not shown and nothing shows how it was replenished. Such control over the bank account renders less credible the testimony as to petitioner's continued absence, for in that case control over the account would be futile. The testimony on the use of the account in petitioner's name is confusing and conflicting. Petitioner testified that it was used for petty cash, incidentals, refunds on accounts receivable, and salaries, principally for the latter and that most of the checks drawn on the account were signed by the bookkeeper. Behling testified that expenses of the business and merchandise were paid from the account and that petitioner signed the checks on the account once a week or whenever the occasion arose. The power given petitioner to keep the bank account in his name, with authority to make withdrawals, at least put him in a position to ascertain how the company's money was being spent and nothing is contrary to the idea that his duties in regard to the account were more than merely to sign checks drawn against it. Some indeterminable control *284 of Wholesale's funds is, under the circumstances, shown to be present in the arrangement. As to the sales of Wholesale, petitioner would have us accept, without considering other circumstances, his and Behling's testimony that the latter was responsible for all of them. Their testimony is in the nature of conclusions on a fact before us for determination. We must examine all of the evidence on the point and in doing so, we are unable to attribute all sales to Behling's efforts. We have already referred to the purchases made from Wholesale by Arrow and the other companies in which petitioner was interested. They were customers of Wholesale before and after the gift and their accounts can not be attributed to efforts of Behling. Wholesale sold only flat roofing material prior to the time Behling was employed in June 1941, and made sales to customers other than to Arrow and petitioner's other companies. Behling did not obtain such business and nothing of record establishes that they did not continue to purchase flat roofing material from Wholesale after Behling's employment. The point is material in view of testimony of petitioner and Behling. Petitioner testified that the sales, *285 listed in his Exhibit No. 9, for the periods January to May, inclusive, and June to October, inclusive, in 1941, under the heading "Others" representing all sales other than to Arrow, Acme and Arrow Sheet Metal Co., were made under accounts acquired by Behling. Behling testified that the sales listed under the heading "Others" in Exhibit No. 10, covering the fiscal years 1942, 1943, and 1944, were made to customers that he brought with him, and that such sales consisted of steep roofing and siding material. Thus petitioner attributes to Behling all sales made to "Others" before he employed him in June 1941, and thereafter in the fiscal year 1941. Obviously Behling was not responsible for sales made before his employment. Behling claimed credit for all of such sales after the gift and confined them to steep roofing material. The effect of his testimony is that no flat roofing material was sold after the gift other than to Arrow and other companies in which petitioner was interested. If such were the situation, the flat roofing material department of Wholesale existed after the gift for no purpose other than to make sales to Arrow and petitioner's other companies. Petitioner's testimony, *286 applicable to 1941 which we recognize as a taxable period not now before us, is as confusing as that of Behling. We are unable to conclude from all the evidence that all of Wholesale's so-called outside customers discontinued the purchase of flat roofing material from it the moment Behling was employed. The petitioner cites and relies largely upon the recent case of , reversing a memorandum opinion of this Court [, as controlling the question here. That case involved family partnerships, in which, as to certain partnership interests conveyed in their entirety, the court concluded, as to each husband, that he retained no right or control in the partnership and exercised none, and otherwise divested himself of all interest and connection with the partnership - retaining "no vestige of right or control in the partnership, and it is undisputed that he in fact exercised none." Here, the divestiture control and connection with the business was by no means so complete as it was in that case; in fact, control was exercised as to the prime object of the transaction - retention of discounts on flat roofing material. *287 Reviewing all of the evidence in this case, including balancing contradictions between testimony and other evidence, we have become convinced that there are not here present the elements prescribed in the Tower case, supra, and , as essential to recognition of a partnership set up in a family, i.e., contribution of capital originating with the alleged partners, or of services; and that the principals there enunciated control here. The minor sons of petitioner contributed nothing by way of capital; he was the source. Nor did they render services which might constitute their contribution. That the petitioner was not formally a member of the partnership does, of course, not control, in the light of the many cases as to looking through form to substance, and as to special scrutiny of family arrangements . We have, as above seen, heretofore held taxable members of family not in form members of partnership. The petitioner here initiated a business for the purpose of securing an unusual discount and advantage in competition. He argues that he gave such business, in effect, with no *288 assets, to his children, divesting himself of all interest and control. Passing the question as to when the deed to the property was delivered (though it was not recorded until February 16, 1942, more than a year after its execution, and more than three months after the alleged gift of the business), it is plain from all of the evidence that the petitioner actually continued, throughout the years here in question and after the purported gift, to accomplish the purpose for which Wholesale was set up - the discount and competitive advantage. He furnished, through his companies, more than two-thirds of Wholesale's business in the first year, and apparently only war-time restrictions caused that proportion to fall to less than one-third in the second year and only a small portion in 1944. Petitioner furnished both the start, and for the first year the continuation, in large part, of the business. He agreed eapecially to continue the bank account as it was before, until the business should be firmly established, and apparently did so until May 1, 1943, when that part of the agreement was abrogated. He lent Wholesale $8,400, and on another occasion Arrow, his company, borrowed $8,000 from *289 the guardian, apparently without payment of interest. The guardian, his wife, apparently received $10,000 during the period covered by her first report, for compensation, despite the fact that she rendered very little service. Petitioner reported substantial contributions to the Bethel Baptist Church in 1941 and 1942, and no deductible contributions in 1943 and 1944. The minors claimed no deductions in 1941 and 1942 for contributions. In 1943 and 1944, Wholesale reported substantial contributions to Bethel Baptist Church, one-fourth of which, and a small amount to the same church, was claimed as deductions by each of the children. That the manager of Wholesale, already working for petitioner prior to the purported gift, later developed a different, though allied, line of sales, of steep roof materials, while the flat roof business declined during the war, does not obscure the fact that, at least when made and for a considerable time thereafter, Wholesale was a furtherance of petitioner's interests, a continuation of his original policy and aim in its formation. In , reliance was placed on the fact that a manager conducted the business instead of *290 the wife, in whose name the matter was handled, but we found the husband taxable. This is not a case where a father desired to bring his sons into co-operation and business with him as they grew in experience; nor one where they took any part. The oldest boy, even after he became of age, is not shown to have gone into or shown any interest in the business, and none are shown to have ever received any of the earnings, except for taxes and insurance policies, payable to petitioner and his wife; and except $130.31 to Robert. The oldest son, Reynold, reported for taxation to him compensation from Arrow, and not from Wholesale, in 1942 for services rendered. Petitioner testified that Reynold and Robert performed services for Wholesale in 1942 and 1943, and received compensation therefor, contrary to the return of Reynold for 1942, and the returns of Robert for such years, which reported no compensation for services rendered, the evidence on the point is made more confusing and conflicting by the absence of any credits in reports of accounts of the wards for the compensations. In the light of the fact that each child had a credit of $39,209.61 from the business (on the guardian books only), *291 it is apparent that the proceeds of the business have in fact, been accumulated. The sum of $19,000, apparently contributed to the business in 1944, is not explained, or shown charged against the children's credits. Nothing indicates that the certificate necessary to public notice of business done by the children has been filed, whereas in March 1941, one had been filed, showing business to be done by the petitioner, as Wholesale. All of this record, with its frequent discrepancies and dearth of proof on vital points, fails to convince us that the petitioner has overcome the presumption of correctness of the deficiency determined, and that petitioner was not, in fact, continuing his own business affairs through the method shown. Further discussion is unnecessary. From all of the evidence we conclude that petitioner retained sufficient control over, and obtained such economic benefits from the business as to make the income therefrom taxable to him under section 22 (a). Decision will be entered for the respondent.